UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| DEBRA MORUZZI,<br><br>        Plaintiff,<br><br>        v.<br><br>MICHAEL J. ASTRUE,<br>Commissioner of the Social<br>Security Administration,<br><br>        Defendant. | Case No. EDCV 11-02040 AJW<br><br>MEMORANDUM OF DECISION |

Plaintiff filed this action seeking reversal of the decision of defendant, the Commissioner of the Social Security Administration (the "Commissioner"), denying plaintiff's application for disability insurance benefits and supplemental security income benefits. The parties have filed a Joint Stipulation ("JS") setting forth their contentions with respect to each disputed issue.

**Administrative Proceedings**

Plaintiff alleges that she became disabled on September 29, 2006 due to major depressive disorder, anxiety, hypothyroidism, arthritis, osteoarthritis of the right foot, bone spurs, fatigue, chronic pain, and obesity. [JS 2; Administrative Record ("AR") 8, 174]. After her applications were finally denied [AR 564-575], plaintiff filed an action for judicial review, which resulted in an order and judgment reversing the Commissioner's decision denying benefits and remanding the case for further administrative proceedings. [AR 576-586]. On remand, the Appeals Council vacated the Commissioner's denial of benefits and

remanded the case to an administrative law judge ("ALJ") for further proceedings consistent with the remand order. [AR 589-590].

On remand, the ALJ conducted two supplemental hearings and issued a new decision denying benefits. [AR 462-471, 514-554, 555-563]. The ALJ found that plaintiff retained the residual functional capacity ("RFC") to perform a restricted range of medium work, as described in more detail in his decision. [AR 467]. The ALJ further found that plaintiff could not perform her past relevant work, but that her RFC did not preclude performance of the alternative medium, unskilled jobs identified by the vocational expert. [AR 469-471]. The ALJ's decision on remand constitutes the Commissioner's final decision with respect to plaintiff's benefits applications. See 20 C.F.R. §§ 404.984(a), 416.1484(a).

**Standard of Review**

The Commissioner's denial of benefits should be disturbed only if it is not supported by substantial evidence or is based on legal error. Stout v. Comm'r, Social Sec. Admin., 454 F.3d 1050, 1054 (9th Cir. 2006); Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002). "Substantial evidence" means "more than a mere scintilla, but less than a preponderance." Bayliss v. Barnhart, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005). "It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005)(internal quotation marks omitted). The court is required to review the record as a whole and to consider evidence detracting from the decision as well as evidence supporting the decision. Robbins v. Social Sec. Admin, 466 F.3d 880, 882 (9th Cir. 2006); Verduzco v. Apfel, 188 F.3d 1087, 1089 (9th Cir. 1999). "Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." Thomas, 278 F.3d at 954 (citing Morgan v. Comm'r of Social Sec. Admin., 169 F.3d 595, 599 (9th Cir. 1999)).

**Discussion**

**Remand order**

Plaintiff contends that the ALJ contravened the remand order by failing properly to assess the medical opinion evidence, the lay witness testimony, and the vocational expert's testimony. [See JS 3-33].[1]

---

[1] Plaintiff quoted lengthy sections of the remand order in the Joint Stipulation, sometimes without punctuation or a citation denoting that the text was excerpted from the remand order and

2

The remand order directed the Commissioner to give plaintiff the opportunity for a new hearing and to issue a new hearing decision with appropriate findings. [AR 586]. The ALJ conducted two supplemental hearings on remand and issued a new decision denying benefits. Accordingly, the ALJ complied with the remand order. The controlling question in this action is whether the ALJ's decision on remand is supported by substantial evidence and is free of legal error. See Strauss v. Comm'r of the Social Sec. Admin., 635 F.3d 1135, 1137 (9th Cir. 2011) (holding that the district court erred in awarding benefits due to the ALJ's noncompliance with its remand order without reaching the merits of the ALJ's disability determination).

**Treating psychiatrist**

Plaintiff contends that the ALJ did not properly evaluate the opinion of her treating psychiatrist, Jesse R. Devera, M.D. [See JS 3-9].

The record indicates that plaintiff began seeing Dr. Devera at Lucerne Valley Counseling, a San Bernardino County Department of Behavioral Health ("County Behavioral Health") clinic, in May 2005. Her diagnosis was major depressive disorder, recurrent, severe, without psychotic features. Dr. Devera prescribed antidepressant medications, including Lexapro and Cymbalta. [AR 37-38, 229-234, 255-266, 269-276, 374-384, 425-448].

In June 2005, shortly after she started seeing Dr. Devera, plaintiff was admitted to Arrowhead Regional Medical Center ("ARMC") "with suicidal ideas, impaired judgment, hopelessness, anxiety, and irritability." [AR 320; see AR 316-337]. She told the attending physician that she was overwhelmed with depression related to her responsibilities as the adoptive parent of her 3- and 5-year-old grandchildren, who were the children of her drug-addicted daughter, and as the caretaker of another adult daughter, who was brain-injured and wheelchair-bound. [AR 327-329, 332]. Plaintiff received five days of inpatient care at ARMC. [AR 9, 327-337, 380].

Plaintiff's discharge summary states that her diagnosis was major depressive disorder, recurrent,

---

was referencing the merits of the ALJ's *prior* decision, not the decision on remand. [See, e.g. AR 5:6-7:23]. This made plaintiff's briefing unnecessarily verbose and confusing. In addition, plaintiff repeatedly argued that the Ninth Circuit has "held" or "determined" a proposition of law, but she cited only to district court decisions, rather than to published Ninth Circuit opinions. [See JS 11:26-12:2, 18:20-21, 19:21-25, 25:19-26; 30:27-31:3]. It is elementary federal jurisprudence that federal district court decisions are not circuit law. Plaintiff's citation to district court decisions in these instances is inaccurate and potentially misleading.

severe. The attending physician stated that her mood had been stabilized with medications, and she also had been treated for symptomatic allergies and a urinary tract infection. Plaintiff had participated in group therapy and "did well" with it. She was discharged in "improved" condition, without suicidal ideation or psychosis. She was prescribed Lexapro, Klonopin, Wellbutrin, and Seroquel for her psychiatric condition and was instructed to follow up at a County Behavioral Health clinic [AR 320-321].

In July 2005, plaintiff returned to Dr. Devera for follow-up, and she continued to see him monthly until December 2007. [See AR 37-38, 229-234, 255-266, 269-276, 374-384, 425-448]. In December 2007, Dr. Devera completed a "Work Capacity Evaluation (Mental)" checklist form indicating that plaintiff had "moderate" or "marked" limitations in all of the work-related mental functional abilities listed on the form. The form did not ask for supporting findings or diagnoses, and Dr. Devera did not provide any. [AR 419-420].

In January 2008, plaintiff went to a different County Behavioral Health clinic and saw Romeo Villar, M.D. for a medication visit. [AR 803]. After that visit, there is a gap in the treatment records until September 2008, when plaintiff returned to Dr. Villar for complaints of anxiety and depression. Plaintiff's mental status examination was "within normal limits" except for her insight and judgment, which were "fair." Dr. Villar diagnosed major depression, recurrent, without psychosis, and prescribed medication. [AR 799-800].

Plaintiff continued to see a County Behavioral Health doctor for monthly medication visits until May 24, 2010. [AR 760-802, 808-809]. After plaintiff missed two appointments, it was noted that she was "incarcerated and has been receiving jail services." [AR 760].

On August 30, 2010, plaintiff presented to a "Crisis Walk-In Center" in Victorville, California complaining of anxiety and depression since being off her prior medications. She was restarted on Cymbalta. [AR 809].

On April 13, 2011, plaintiff presented to the emergency department of St. Mary's Hospital in Apple Valley with complaints of anxiety. She was given medication and discharged with instructions to follow up with her primary care provider. [AR 831-837]. Plaintiff returned to St. Mary's Hospital on May 17, 2011 complaining of anxiety and suicidal ideation, and she was held for psychiatric evaluation. [AR 821-828]. On both of those occasions she reported having recently smoked marijuana. [AR 826, 832, 837].

4

During the hearing, plaintiff testified that she continued to take an antidepressant (amitryptiline) that was prescribed by a doctor at St. Mary's Hospital. Plaintiff said that she no longer saw a psychiatrist at County Behavioral Health because they "cut [her] out" due to "cutbacks." [AR 521-522].

Where the opinion of a treating or examining physician is uncontroverted, the ALJ must provide clear and convincing reasons, supported by substantial evidence in the record, for rejecting it. If contradicted by that of another doctor, a treating or examining source opinion may be rejected for specific and legitimate reasons that are based on substantial evidence in the record. Batson v. Comm'r of Social Sec. Admin., 359 F.3d 1190, 1195 (9th Cir. 2004); Tonapetyan v. Halter, 242 F.3d 1144, 1148-49 (9th Cir. 2001); Lester v. Chater, 81 F.3d 821, 830-831 (9th Cir. 1995).

The ALJ found that plaintiff had severe mental impairments consisting of major depressive disorder; anxiety disorder, not otherwise specified; and polysubstance abuse and dependence in remission, by history. Relying on the medical expert's testimony, the ALJ rejected Dr. Devera's December 2007 functional assessment because it was inconsistent with his treating source notes and other treating source evidence. The ALJ found that plaintiff's mental impairments restricted her simple, repetitive tasks, superficial contact with the public, occasional non-intense interactions with coworkers and supervisors, no hypervigilance, and no fast-paced work such as rapid assembly lines. [AR 467].

Inconsistency between a treating doctor's opinion and his or her treatment notes is a valid reason for rejecting a treating source opinion. See Connett v. Barnhart, 340 F.3d 871, 875 (9th Cir. 2003) (holding that the ALJ permissibly rejected the contradicted opinion of a treating doctor whose "extensive conclusions regarding [the claimant's] limitations are not supported by his own treatment notes"). The ALJ permissibly discounted the severity of the limitations that Dr. Devera checked off on the evaluation form because they were inconsistent with his treatment notes. There is no suggestion in Dr. Devera's notes that plaintiff had the marked functional limitations indicated on his December 2007 checklist. When Dr. Devera began treating plaintiff, her mood was "depressed," but as treatment progressed, her mood was "improved," "less depressed," or "good," while her affect was most often described as "appropriate," "brighter" or "improving." Dr. Devera documented no psychotic symptoms and no suicidal or homicidal ideation. Plaintiff was alert and oriented. She exhibited coherent and relevant thought process and thought content, intact memory, fair to good insight. She was cooperative and not in distress. Her medication compliance

was good. [See AR 229-234, 256-276, 426-427, 431-433, 435, 440-441]. Dr. Devera's notes say that plaintiff was "doing better," "improving" and "doing fairly well with this regimen." [AR 430, 431, 433, 436, 440]. In December 2006, one year before he completed the checklist form, Dr. Devera signed a "Mental Disorder Questionnaire Form." He left blank the sections asking for a narrative assessment of plaintiff's history, symptoms, mental status, and functional abilities and stated that he expected her condition to improve in about a year. [AR 251-255].

Dr. Devera's progress notes indicate that plaintiff's subjective symptoms improved with treatment, and with isolated exceptions (e.g., AR 438 (plaintiff reported feeling "terrible" due to carpal tunnel and waking up in pain), her subjective complaints do not suggest the degree of mental impairment Dr. Devera noted in his December 2007 checklist. For example, on the date Dr. Devera completed that checklist, plaintiff reported that she was "doing better," was "ready for the holiday," and had "a new friend." [AR 426; see also AR 273 (September 2005 - "Medication is helping; preventing me from going [over] the edge. Still get[] depressed and anxious."); AR 272 (September 2005 - "I'm feeling better. Nothing is new. No problem [with] my meds."); AR 271 (December 2005 - Plaintiff said that she was "functioning," had run out of her medications, and that her "mood was up and down still."); AR 270 (March 2006 - Plaintiff reported feeling "'so-so' - not too bad"); AR 444 (August 2006 - Plaintiff was feeling "[p]retty good." She was taking her thyroid medication and applying for SSI."); AR 441 (October 2006 - Plaintiff was "doing better." She had a lot of foot pain and had an x-ray taken the previous day.); AR 437 (March 2007 -"I feel better."); AR 436 (April 2007 - Plaintiff was "doing better." Her daughter wanted her boyfriend to move in, and plaintiff said that she did not get along with him.); AR 435 (May 2007 - "Not too bad. More active." Plaintiff reported that her daughter's boyfriend moved in, and that she drove them to work.); AR 433 (June 2007 - "Still feeling alright. Still more active." Plaintiff reported that her daughter was in the hospital again and had agreed to go to a sober living home.); AR 432 (July 2007 - "Nothing is new except for being hot. Trying to get a loan to buy a house."); AR 431 (August 2007 - "I'm happy all the time now."); AR 430 (September 2007 - "I'm losing weight. I'm feeling better."); AR 427 ("'Still doing good.' Dealing [with] things better. '[T]rying to be me and taking care of myself.'") ]. The ALJ permissibly concluded that the severity of mental limitations reflected in Dr. Devera's December 2007 checklist was not consistent with his treatment notes.

6

The ALJ also discounted Dr. Devera's December 2007 opinion because it was inconsistent with Dr. Villar's treating source opinion from September 2008, when plaintiff resumed treatment after a gap of about eight months. Despite having been off her medication for several months and complaining subjectively of depression and anxiety, plaintiff's appearance, behavior, speech, mood, affect, perceptual process, thought process, thought content, memory, and orientation were within normal limits. Only her insight and judgment were impaired, and those were "fair." Dr. Villar diagnosed major depression, recurrent, without psychosis, and prescribed mediation. [AR 452-453]. On return visits in October 2008 and November 2008, Dr. Villar noted that plaintiff said she was "fine" and was "doing well [with] medications." [AR 789, 791]. Dr. Villar's treating source reports, which are based on his independent clinical findings, provided an additional, legitimate reason for the ALJ's rejection of Dr. Devera's opinion. See Orn v. Astrue, 495 F.3d 625, 631 (9th Cir. 2007) ("Additional factors relevant to evaluating any medical opinion, not limited to the opinion of the treating physician, include the amount of relevant evidence that supports the opinion and the quality of the explanation provided [and] the consistency of the medical opinion with the record as a whole . . . ."); Tonapetyan, 242 F.3d at 1149 (holding that the ALJ permissibly rejected a treating physician's opinion "because it was unsupported by rationale or treatment notes," that the contrary opinions of an examining and non-examining physician "serve as additional specific and legitimate reasons for rejecting the opinions," and that the contrary examining and non-examining source opinions constitute substantial evidence because they were based on objective findings independent of those relied on by the treating physician).

The ALJ also noted the "wide variation in the GAF scores[2] of record, which only highlights the fact that the use of such scores varies from doctor to doctor and is merely a snapshot of a doctor's opinion . . .

---

[2] The GAF (Global Assessment of Function) score is a "multiaxial" assessment that reflects a clinician's subjective judgment of a patient's overall by asking the clinician to rate the more severe of two components: the severity of a patient's psychological symptoms, or the patient's combined psychological, social, and occupational functioning. The GAF score represents the more severe of these two components. See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition ("DSM-IV") Multiaxial Assessment, 27-36 (4th ed. 2000)). "A GAF score is a rough estimate of an individual's psychological, social, and occupational functioning used to reflect the individual's need for treatment." Vargas v. Lambert, 159 F.3d 1161, 1164 n. 2 (9th Cir.1998).

." [AR 467 (footnoted added)]. The ALJ articulated legally sufficient reasons for the weight accorded the treating source evidence. In these circumstances, the ALJ did not err in giving little weight to the GAF scores. See Jones v. Astrue, 619 F.3d 963, 974 (8th Cir. 2010) ("[A]n ALJ may afford greater weight to medical evidence and testimony than to GAF scores when the evidence requires it."); Howard v. Comm'r of Social Sec., 276 F.3d 235, 241 (6th Cir. 2002) ("While a GAF score may be of considerable help to the ALJ in formulating the RFC, it is not essential to the RFC's accuracy. Thus, the ALJ's failure to reference the GAF score in the RFC, standing alone, does not make the RFC inaccurate."); see also Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50746, 50764-65 (August 21, 2000)(explaining that the Commissioner has not endorsed the use of the GAF scale in the disability insurance and SSI programs, and explaining that the GAF scale "does not have a direct correlation to the severity requirements in our mental disorders listings").

The ALJ articulated specific, legitimate reasons based on substantial evidence for his evaluation of Dr. Devera's opinion.

**Nonexamining state agency physician**

Plaintiff contends that the ALJ erred in failing to properly evaluate the opinion of the nonexamining state agency physician, Dr. Gregg. [See JS 16-22]. More specifically, plaintiff contends that the ALJ addressed Dr. Gregg's opinion but did not properly consider specific findings made by Dr. Gregg on a January 2007 "Mental Residual Functional Capacity Assessment" form. [JS 18-19].

On the mental RFC assessment form [AR 338-351], Dr. Gregg indicated that plaintiff was "moderately limited" in the ability to: (1) understand, remember, and carry out detailed instructions; (2) maintain concentration and attention for extended periods; (3) interact appropriately with the general public; and (4) accept instructions and respond appropriately to criticism from supervisors. Plaintiff was "not significantly limited" in any of the remaining areas assessed. [AR 338-340]. Asked to describe plaintiff's mental RFC in narrative form, Dr. Gregg opined that plaintiff was "able to perform simple and repetitive work with adequate concentration, pace, and persistence," "adapt to changes in the work place," and "complete a normal 40 hour work week with no public contact." [AR 340].

The ALJ remarked that Dr. Gregg's findings and opinion were "essentially consistent with" his mental RFC finding, which limited plaintiff to work involving simple, repetitive tasks; superficial contact

with the public; occasional non-intense interactions with coworkers and supervisors; no hypervigilance; and no fast-paced work such as rapid assembly lines. [AR 467]. The ALJ's interpretation of Dr. Gregg's opinion was reasonable. The ALJ's RFC finding restricting plaintiff to simple, repetitive work with no hypervigilance and no fast-paced work adequately captured Dr. Gregg's findings that plaintiff was "moderately limited" with respect to detailed instructions, attention, and concentration. The ALJ's finding restricting plaintiff to superficial public contact and occasional non-intense interactions with coworkers and supervisors adequately captured Dr. Gregg's findings that plaintiff was "moderately limited" in interacting with the general public and supervisors. See Stubbs-Danielson v. Astrue, 539 F.3d 1169, 1174 (9th Cir. 2008) (holding that the ALJ's finding that the claimant could perform "simple tasks" adequately captured a "moderate" limitation in the ability "to perform at a consistent pace without an unreasonable number of rest periods" and "several moderate limitations in other mental areas") (citing Howard v. Massanari, 255 F.3d 577, 582 (8th Cir. 2001) (holding that where a state psychologist opined that the claimant's deficiencies in concentration, persistence or pace did not preclude her from "sustain[ing] sufficient concentration and attention to perform at least simple, repetitive, and routine cognitive activity without severe restriction of function," the ALJ's hypothetical question positing the ability to perform "simple, routine, repetitive tasks" was proper)). Moreover, moderate mental functional limitations are not necessarily incompatible with the ability to work. See, e.g., Thomas, 278 F.3d at 953, 955 (affirming the ALJ's finding that a claimant who had "moderate mental residual functional capacity limitations" and a "marked limitation in her ability to maintain concentration over extended periods" could perform the unskilled jobs identified by the VE); Russey v. Massanari, 2001 WL 1242901, at *2, *10 (N.D. Ill. Oct. 12, 2001) (holding that the ALJ properly found that a claimant who was moderately limited in his ability to understand, remember and carry out detailed instructions, and get along with peers and coworkers without distracting them or exhibiting behavioral extremes, and markedly limited in his ability to interact appropriately with the general public, could perform unskilled work).

**Lay witness testimony**

Plaintiff contends that the ALJ did not properly consider a "Third Party Function Report" completed by Katy King, plaintiff's County Behavioral Health case manager. Ms. King said that she had seen plaintiff on a weekly basis for three years. Among other things, Ms. King commented on plaintiff's often disheveled

9

appearance, tendency to become distraught, inability to handle stress, and problems with concentration, memory, and following instructions. [JS 12-15; AR 183-190].

"An ALJ need only give germane reasons for discrediting the testimony of lay witnesses." Bayliss, 427 F.3d at 1218 (citing Lewis v. Apfel, 236 F.3d 503, 511 (9th Cir. 2001)). The ALJ gave Ms. King's report "little weight" to the extent that it was inconsistent with his RFC finding, which already incorporated mental functional limitations in areas such as concentration and following instructions. The ALJ noted that Ms. King's November 16, 2006 report was dated shortly after plaintiff's September 29, 2006 alleged onset date. Thus, almost all of her observations of plaintiff were made during a period of time when plaintiff, by her own account, was not disabled. The ALJ pointed out that as a case manager, Ms. King, who identified herself as having an "M.H.S." (master's degree in Health Science), did not have a specialized expertise with respect to plaintiff's physical or emotional problems that would entitle her conclusions regarding plaintiff's physical and emotional problems to any greater weight. See 20 C.F.R. §§ 404.1508, 404.1513(a), 416.908, 416.913(a) (requiring evidence from "acceptable medical sources," such as a licensed physician or psychologist, to establish the existence of a medically determinable impairment). Finally, the ALJ noted that Ms. King's statements that on many days plaintiff could not perform the activities of daily living and was limited in every physical and mental functional ability listed on the form except for seeing, speaking, and hearing was inconsistent with the medical record evidence summarized elsewhere in his decision. See Bayliss, 427 F.3d at 1218 (stating that "[i]nconsistency with medical evidence" is a germane reason for discrediting lay testimony).

To the extent that the ALJ rejected Ms. King's lay testimony, he provided germane reasons for doing so.

**Vocational expert's testimony**

Plaintiff contends that the vocational expert's testimony does not constitute substantial evidence supporting the ALJ's nondisability determination because: (1) the ALJ's hypothetical question to the vocational expert failed to incorporate all of the limitations assessed by Dr. Devera, Dr. Gregg, and Ms. King [JS 28-31]; and (2) the demands of the jobs identified by the vocational expert are inconsistent with plaintiff's RFC. [JS 34-41].

**The ALJ's hypothetical questions**

Hypothetical questions posed to the vocational expert must accurately describe all of the limitations and restrictions of the claimant that are supported by substantial evidence in the record. Robbins, 466 F.3d at 886; Tackett v. Apfel, 180 F.3d 1094, 1101 (9th Cir. 1999). For the reasons described above, the ALJ properly weighed the medical evidence and the lay witness testimony. The ALJ's hypothetical questions "contained all of the limitations that the ALJ found credible and supported by substantial evidence in the record. The ALJ's reliance on testimony the [vocational expert] gave in response to the hypothetical therefore was proper." Bayliss, 427 F.3d at 1217.

**Inconsistency with information in the Dictionary of Occupational Titles ("DOT")**

An ALJ may not rely on a vocational expert's testimony regarding the requirements of a particular job without first inquiring whether that testimony conflicts with the DOT. Massachi v. Astrue, 486 F.3d 1149, 1152 (9th Cir. 2007). The vocational expert testified that the hypothetical person posited by the ALJ could perform the medium, unskilled jobs of floor waxer and production helper as classified in the Dictionary of Occupational Titles ("DOT"). The vocational expert also said that his testimony was consistent with information in the DOT. [AR 560-561].

Plaintiff contends that because medium work requires "standing or walking, on and off, for a total of approximately 6 hours in an 8-hour workday," those jobs are inconsistent with the ALJ's finding that plaintiff can "sit two hours at a time for a total of six hours in an eight-hour workday, stand two hours at a time for a total of six hours in an eight-hour workday, and walk two hours at a time for a total of six hours in an eight-hour workday . . . ." [JS 36-38; AR 467]. Plaintiff argues that she "would not be able to sit two hours at a time for a total of six hours in an eight-hour workday as the ALJ suggests and still be able to perform medium work. [She] would only be able to sit intermittently throughout the day for no more than two hours total." [JS 36-38].

Plaintiff misconstrues the ALJ's RFC finding. Medium work involves "standing or walking, off and on, for a total of approximately 6 hours in an 8-hour workday . . . . [S]itting may occur intermittently during the remaining time." SSR 83-10, 1983 WL 31251, at *6. The ALJ found that plaintiff could stand and walk for a total of six hours total in an eight-hour workday, provided she could alternate between standing and walking at least every two hours. That RFC is facially consistent with the Commissioner's definition of medium work. Furthermore, the vocational expert testified that a person with plaintiff's RFC

could perform the jobs of floor waxer and production assistant, both of which are classified in the DOT as medium work. [AR 560-561].

The ALJ also found that plaintiff could sit for two hours at a time for up to six hours in an eight-hour workday, but he did not find that she was *required* to be able sit for two hours at a time. Her RFC contemplates the ability to sit intermittently for up two hours at a time and up to six hours total in an eight-hour workday, as required to perform the medium jobs identified by the vocational expert. [AR 467].

Plaintiff also contends that the DOT job of production helper involves "fast paced work" and "rapid assembly line type work" precluded by her RFC because it would require her to feed machine hoppers with ingredients, transport and packs finished products, load packaging machines with bags, cans, and jars, verify weights of filled containers emerging from packaging machines, and remove foreign material from food on conveyor belts.

The DOT job description does not describe the pace of the work ordinarily involved in the production helper job. Because plaintiff's RFC does not preclude all assembly-line type work, only "fast paced work like rapid assembly lines," the vocational expert's testimony and the DOT production helper job description do not necessarily conflict. The vocational expert testified that plaintiff's RFC would not preclude performance of the production helper job, and he explicitly testified that he had considered the mental limitations in the ALJ's hypothetical question, including the limitation to no fast-paced work like rapid assembly lines. [AR 467, 558, 561-562]. The vocational expert also said that his testimony was consistent with the DOT [AR 561]. Therefore, that testimony constitutes substantial evidence supporting the ALJ's finding that plaintiff can perform the production helper job.

Alternatively, even if a conflict exists and the ALJ erred in relying on the vocational expert's testimony regarding the production helper job, any error was harmless. See McLeod v. Astrue, 640 F.3d 881, 886-888 (9th Cir. 2011) (holding that the same kind of harmless error rule that courts ordinarily apply in civil cases applies in social security disability cases, and that the burden is on the party attacking the agency's determination to show that prejudice resulted from the error) (citing Shinseki v. Sanders, 556 U.S. 396, 406-409, 413-414 (2009)). The vocational expert's uncontroverted testimony was that there are 6,100 floor waxer jobs in the regional economy and 130,000 such jobs nationwide. That testimony is sufficient to support the ALJ's finding at step five. See Meanel v. Apfel, 172 F.3d 1111, 1115 (9th Cir. 1999)

(holding that between 1000 and 1500 jobs in the local area was a significant number of jobs) (citing Barker v. Sec'y of Health & Human Servs., 882 F.2d 1474, 1479 (9th Cir. 1989)).

**Development of the record**

Plaintiff contends that the ALJ breached his duty to develop the record by failing to obtain updated mental health treatment records. [JS 42-47].

The ALJ has a "special duty to fully and fairly develop the record and to assure that the claimant's interests are considered," even where, as here, "the claimant is represented by counsel." Celaya v. Halter, 332 F.3d 1177, 1183 (9th Cir. 2003) (quoting Brown v. Heckler, 713 F.2d 441, 443 (9th Cir. 1983)); see Smolen v. Chater, 80 F.3d 1273, 1288 (9th Cir. 1996). A claimant, however, retains the burden of proving that he is disabled. Mayes v. Massanari, 276 F.3d 453, 459 (9th Cir. 2001). The ALJ's "duty to develop the record further is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." Mayes, 276 F.3d at 459-460.

During the February 9, 2011 hearing on remand, plaintiff was represented by counsel. She testified that she had been "cut out" from receiving County Behavioral Health services about six months earlier, and that St. Mary's Hospital was currently prescribing an antidepressant for her. She could not name her provider and was vague about the specifics. [AR 522-524]. Based on this testimony, plaintiff argues that the ALJ erred in failing to obtain additional treatment records. [See JS 42].

Plaintiff's argument lacks merit. At the conclusion of the February 2011 hearing, the ALJ asked plaintiff's counsel whether all of plaintiff's available treatment records from her alleged onset date onward were part of the record. [AR 553]. Plaintiff's counsel answered, "Well, to my knowledge, all the records are complete." [AR 553]. She added that she had nothing else to present. [AR 553]. The ALJ had no obligation to search for additional records when plaintiff's attorney affirmatively represented that the records were complete. See Mayes, 276 F.3d at 459-460 (rejecting the argument that the ALJ breached his duty to develop the record as an impermissible attempt to shift the burden of proving disability away from the claimant).

A few days before the September 9, 2011 hearing, plaintiff's counsel submitted additional evidence consisting of April 2011 and May 2011 treatment records from St. Mary's Hospital, which the ALJ made part of the record and discussed in his decision. If there were other records available from St. Mary's

1 Hospital, as plaintiff now seems to suggest, her attorney could have submitted them at that time, asked the
2 ALJ to subpoena them, or asked the ALJ to leave the record open for the submission of additional evidence.
3 Plaintiff's counsel did none of those things, and even now does not identify specific records that are or may
4 be missing from the record. Under these circumstances, the ALJ did not breach his duty to develop the
5 record, and there is no basis for concluding that the record is not adequately developed. See Duenas v.
6 Shalala, 34 F.3d 719, 722 (9th Cir. 1994) (holding that the ALJ did not violate her duty to develop the
7 record where "[n]o request was made of the ALJ to develop the record, and it is unclear what further the
8 ALJ could have done . . . ."), cert. denied, 514 U.S. 1051 (1995).

**Conclusion**

For the reasons stated above, the Commissioner's decision is supported by substantial evidence and is free of legal error. Accordingly, the Commissioner's decision is **affirmed.**

**IT IS SO ORDERED.**

November 5, 2012

_____
ANDREW J. WISTRICH
United States Magistrate Judge